U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| In Re:<br>LARRY NORBERT LUEBCKE,<br>Debtor<br>******************************** | ) | Chapter 7 Proceedings<br>Case No: 14-20332-jpk |
| THE NOVOGRODER COMPANIES, INC.,<br>Plaintiff,<br><br>v.<br><br>LARRY NORBERT LUEBCKE,<br>Defendant. | ) | Adversary Proceeding No. |

**COMPLAINT/OBJECTION TO DISCHARGE**

Comes now, Plaintiff, The Novogroder Companies, Inc., by counsel, and in support of its Complaint for Objection to Discharge, states as follows:

**PARTIES/JURISDICTION**

1. Defendant, Larry Norbert Luebcke ("Luebcke") is the Debtor in the above referenced Chapter 7 case filed on February 18, 2014.

2. The Novogroder Companies, Inc. ("Novogroder") is a Creditor of the Defendant.

3. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334.

4. This Complaint is a core proceeding pursuant to 11 U.S.C. § 157.

5. Novogroder's Complaint is based on 11 U.S.C. § 523(a)(6), 11 U.S.C. § 523(c)(l), 11 U.S.C. § 727(b) and Bankruptcy Rules 4004, 4007, and 7001.

**COUNT I**

**INTENTIONAL DAMAGE**

1. Luebcke was a tenant on a Lease executed with Novogroder for a Mexican restaurant located in a shopping center known as the "Lowell Commons" (hereinafter "Leased Premises"). The Lease is attached hereto as Exhibit A and incorporated herein as if fully set forth.

2. The Bankruptcy Code does not discharge any debt arising from "willful and malicious injury by the Debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "'Willful and malicious'" means a deliberate or intentional wrongful act, done without excuse or just cause, which produces or results in harm or injury, and that the wrongdoer need not have a specific intent to cause the resulting harm or injury to the person and property of the plaintiff." *In re Mills*, 111 B.R. 186, 194 (N.D. Ind. Bankr. 1988). "It is the intent to do the act, which is the legal event, and not the intent to do harm." *Id.*

3. Luebcke removed personal property that Novogroder had an interest in and damaged the Leased Premises.

4. Luebcke's actions with respect to the Leased Premises were willful and malicious because he intentionally damaged the Leased Premises.

5. Luebcke's actions were without excuse or just cause.

6. Luebcke's actions resulted in pecuniary loss to Plaintiff.

7. Novogroder's claim against Defendant is not subject to discharge, pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, pursuant to 11 U.S.C. § 523(a)(6), the Novogroder Companies, Inc., by counsel, respectfully requests that this Court deny a discharge with respect to Novogroder so

Novogroder may recover damages, prejudgment and postjudgment interest, and all other just and appropriate relief.

Respectfully submitted,

**KORANSKY, BOUWER & PORACKY, P.C.**

By: /s/ Greg A. Bouwer
Greg A. Bouwer (#16368-53)
425 Joliet Street, Suite 425
Dyer, IN 46311
Telephone: 219/865-6700
Facsimile: 219/865-5840

**COUNT II**

**UNAUTHORIZED CONTROL**

8. For paragraphs 1-7 of this Count II, Plaintiff, The Novogroder Companies, Inc., incorporates paragraphs 1-7 of Count I as fully set forth hereinabove.

9. Under the Lease, the tenant granted Novogroder a security interest in all personal property at the Leased Premises. In addition, Luebcke promised Novogroder that he would not remove any personal property from the Leased Premises.

10. Luebcke removed the personal property from the Leased Premises and knowingly and intentionally exerted unauthorized control over such property.

11. Novogroder has sustained loss and damage caused by the intentional and deliberate acts of Luebcke, and Novogroder's claim is not subject to discharge pursuant to 11 USC § 523(a)(6).

**WHEREFORE**, pursuant to 11 U.S.C. § 523(a)(6), the Novogroder Companies, Inc., by counsel, respectfully requests that this Court deny a discharge with respect to Novogroder so

Novogroder may recover damages, prejudgment and post judgment interest, and all other just and appropriate relief.

Respectfully submitted,

**KORANSKY, BOUWER & PORACKY, P.C.**

By: /s/ Greg A. Bouwer

Greg A. Bouwer (#16368-53)
425 Joliet Street, Suite 425
Dyer, IN 46311
Telephone: 219/865-6700
Facsimile: 219/865-5840

EXHIBIT A

# LEASE

Agreement of LEASE made and entered into as of the 10th day of February, XX 2010.

## WITNESSETH:

## ARTICLE I

## CERTAIN DEFINITIONS and BASIC LEASE TERMS

1.01 **Certain Definitions.** As used herein:

(a) "Landlord" shall mean THE NOVOGRODER CO., INC., as Agent, 875 N. Michigan Avenue, Chicago, Illinois 60611.

(b) "Tenant" shall mean RON BURGET
MICHELLE BURGET
LARRY LUEBCKE

Address of Tenant: 10805 Broadway Avenue
Crown Point, IN 46307

Leased Premises: East Corner Store of Lowell Commons -
I-65 and Route 2

(c) "Leased Premises" shall mean the premises within the Shopping Center designated as location East Corner Store of Lowell Commons - I-65 and Route 2 having a Floor Area of approximately 3,600 square feet, except the rights and interests reserved and excepted as hereinafter set forth in this Lease.

(d) "Shopping Center" shall mean the real estate described in Exhibit "A" attached hereto, including any and all improvements now or at any time located thereon, excluding any portion that may be taken by eminent domain, or be dedicated for public use, known as the Lowell Commons.

(e) "Lease" shall mean Articles I through XII hereof and the exhibits referred to herein which, by such references, are hereby adopted and made a part hereof, together with any amendments, modifications, schedules or plans specifically referred to herein.

1.02 **OTHER DEFINITIONS.** For clarity and convenience, other terms defined herein from time to time, and wherever used in this Lease shall have the defined meaning so given.

1.03 **DEMISE.** Landlord hereby leases to Tenant, and Tenant accepts and takes from Landlord, the leased Premises under any subject to the terms, conditions, and convenants contained in the Lease and any renewals or extensions thereof.

1.04 **LEASE TERM.** The Lease Term shall be the period commencing on the 1st day of April ~~XX 2009~~ 2010 LL, and continuing thereafter, unless sooner terminated as in this Lease provided, until and including the 31st day of May, XX ~~2014~~ 2015 LL. LB MB [initials]

Actual Lease dates will commence the earlier of when the Tenant opens for business or June 1, 2010. The Lease will then continue for 60 months.

1.05 RENTS. Tenant agrees to pay to Landlord for possession and use of the Leased Premises, without right of offset or deduction for any reason, the following rents:

(a) Minimum Rent. The Tenant shall pay "Minimum Rent" at the rate of $ *See below per annum, in advance monthly installments of $ *See below (prorated for fractional months) on the first day of each calendar month during the Lease Term.

~~(b) Percentage Rent. Tenant shall pay, as additional rent, a percentage rent of ______ per cent of Gross Sales per Lease Year, as set forth in Article IV of this Lease.~~

(c) Common Area Maintenance Charge. Tenant shall also pay, as additional rent, "Tenant's pro rata share of the Common Area Costs according to Article V of this lease.

(d) Real Estate Taxes. Tenant shall also pay, as additional rent, Tenant's pro rata share of the Shopping Center's Real Estate Taxes according to Section 8:01 (c) of this Lease.

(e) Insurance. Tenant shall also pay, as additional rent, Tenant's pro rata share of the fire and extended coverage for LOWELL COMMONS

~~(f) In addition to the minimum rental provided for in Paragraph 1.05 (a), there will be a yearly adjustment during the term hereof and any extension or renewal hereof, of such rental based upon the Consumer Price Index. No adjustments are to be made for the first year of the initial term. Thereafter, the minimum monthly rent provided for in Paragraph 1.05 (a) shall be subject to adjustment at the commencement of the second year of the term and each year thereafter ("the adjustment date") as follows:~~

~~In addition to the basic monthly rental provided for in Paragraph 1.05 (a), there will be a yearly adjustment of such rental during the term hereof and any extension or renewal thereof, based on the "BLS Consumers' Price Index" or "Consumer Price Index", as specified herein. The basic monthly rental shall be adjusted and changed as follows: Such adjustment and change in the basic rent shall be determined in accordance with cost of living changes in the "BLS Consumers' Price Index" or "Consumer Price Index". The "BLS Consumers' Price Index figure for the month of ______, 1981 is hereby fixed and established as and referred to herein as the "Base" or the "base index figure" in the computation of adjustment of rentals herein provided for. At the beginning of each successive lease year, beginning ______ ("adjustment date"), the "BLS Consumers' Price Index" for the preceding month, ______ thereto shall be ascertained and noted and the rental commencing with the start of each lease year shall be adjusted by increasing the basic monthly rent, percentagewise, as the said "BLS Consumers' Price Index" for the month has increased as compared with the base "BLS Consumers' Price Index" figures as herein fixed. There shall be no adjustment if such "BLS Consumers' Price Index" is lower than the figure for ______. That is to say, that if the "BLS Consumers' Price Index" for the month of ______ preceding the forthcoming lease year has increased over the "BLS Consumers' Price Index" for the month of ______, then at the beginning of each lease year, commencing on ______ an adjustment shall be made to the basic monthly rental. In such event, the basic monthly rental for such lease year shall be set by multiplying the basic monthly minimum rental as provided in Paragraph 1.05 (a) by a fraction, the numerator of which is the "BLS Consumers' Price Index" for the month of ______ and the denominator of which is the "BLS Consumers' Price Index" for the month of ______. All such adjustments shall be made to the nearest full percentage point. Each year, thereafter, a similar adjustment is to be made. The term, "lease year" as used in this Article, is for the period commencing on ______ and ending on ______. In no event shall the rent in any given year increase more than 10% of the previous year's rent.~~

~~(g) The "BLS Consumers' Price Index" or Consumer Price Index" referred to herein shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers for the City of Chicago, Illinois, ALL ITEMS, 1967 – 100, published by the United States Department of Labor, Bureau of Labor Statistics. Further, (1) if the manner in which the "BLS Consumers' Price Index" is determined by the United States Department of Labor shall be substantially revised, an adjustment shall be made in such revised index which would produce results equivalent, as nearly possible, to those which would have been obtained if the "BLS Consumers' Price Index" had not been so revised; (2) if the 1967 average shall no longer be used as an index of 100, such change shall constitute a substantial revision; (3) in the event that at any time during the term hereof, the United States Bureau of Labor Statistics shall discontinue the issuance of "BLS Consumers' Price Index" for whatever reason whatsoever, then in such event or events, the parties hereto agree to use any other standard, nationally recognized cost of living index then issued and available, which is published by the United States Government, and if the parties are unable to agree within the first month of a lease year, then Lessor shall have the right to substitute therefor a comparable inflationary index published by any other governmental agency, or if no such index shall be available, then a comparable index published by a major bank or other financial institution or by a university or recognized financial publication.~~

1.06 Use of the Premises. Tenant shall use the Leased Premises for the following purposes:

Mexican Restaurant

1.07 Security Deposit. A Security Deposit of $ 4,000.00 shall be held by the Landlord under Section 10.05 hereof. Said Security Deposit shall always equal two (2) months' Rent.

**Minimum Rent**

First 4 months - $2,000.00 per month
Next 8 months - $4,000.00 per month
Next 12 months - $4,160.00 per month
Next 12 months - $4,320.00 per month
Next 12 months - $4,480.00 per month
Next 12 months - $4,640.00 per month

Annual rent is twelve times the monthly rent.

The above rent includes real estate taxes, common area maintenance, and insurance. Tenant will be responsible for their proportionate share of real estate taxes, common area maintenance, and insurance above the Base Year.
Base Year for Real Estate Taxes is 2007 Paid in 2008.
Base Year for CAM and Insurance is 2009.

## ARTICLE II

## SHOPPING CENTER and LEASED PREMISES.

2.01 Shopping Center. It is agreed that the depiction of the Shopping Center on Exhibit "A" does not constitute a representation, or covenant or warranty of any kind by Landlord, and Landlord reserves the right to change the size and dimensions of the Shopping Center, including the number and location of buildings, building dimensions, the number of floors in any of the buildings, store dimensions, identity and type of other stores and tenancies, and the Common Area, except that the Leased Premises shall not be substantially altered without Tenant's prior approval.

2.02 Exception from Leased Premises. Landlord excepts and reserves from Leased Premises the use of the exterior walls and roof thereof; the right to install, maintain, repair, use and replace pipes, ducts, conduits and wires in or upon the Leased Premises in locations that will not materially interfere with Tenant's use thereof, and the right to enter upon the Leased Premises in any reasonable manner necessary to perform any of the duties and responsibilities of Landlord under the Lease or to exercise any of Landlord's rights.

## ARTICLE III

## CONSTRUCTION BY LANDLORD and TENANT.

3.01 Construction by Tenant and Tenant's Plans. Tenant will complete the Tenant's Work at Tenant's expense, in a good and workmanlike manner, in accordance with the plans and specifications hereinafter referred to in this Section 3.02. Prior to beginning any work on the Leased Premises, Tenant shall received Landlord's written approval of plans and specifications for Tenant's Work prepared in conformity with Exhibit "D" and all applicable building codes and regulations in sufficient detail to constitute complete working plans and specifications. Landlord shall approve or disapprove such plans and specifications within fifteen (15) days after receipt. Reasons for disapproval shall be specifically noted, but Landlord may reject the plans for any good reason. Tenant shall cause all work to be performed in conformity with the plans and work to be performed in conformity with the plans and specifications as approved by Landlord and will not make any changes of modifications thereto without Landlord's written consent. Tenant shall obtain all required building permits and approvals from local authorities and furnish copies thereof to Landlord before commencing any of the Tenant's Work.

3.02 Lien Free Completion. Tenant agrees to pay promptly, when due, the entire costs of Tenant's Work; to obtain from each contractor with whom Tenant has contracted for such work, prior to paying any amount to such contractor, a statement in writing under oath, or verified by affidavit, of the names of all parties furnishing materials and labor for such work and the amounts due, or to become due, to each and, at the time of payment, obtain from each contractor a Waiver of Lien in the amount paid to each; to keep the Leased Premises at all times free of liens and claims for liens for labor and materials for work undertaken by Tenant; to furnish Landlord copies of all contracts entered into by Tenant and the sworn statements and waivers of liens therefore, promptly upon receipt of the same by Tenant; to only use contractors previously approved in writing by Landlord; to perform such work with union labor to the extent and in such manner as to insure proper maintenance of good labor relationship and to save Landlord harmless and indemnified from all injury, loss, claims or damage to any person or property occasioned by or growing out of such work. If any claim for Mechanic's Lien arises against the Leased Premises of the Shopping Center by reason of work undertaken by Tenant, and such claim is not discharged, bonded or otherwise satisfied by Tenant within thirty (30) days after written notice to Tenant, the Landlord may pay such claim and proceed to obtain the discharge and release thereof, and Tenant shall pay Landlord as additional rent the amount paid by Landlord to obtain the discharge and release thereof, together with court costs and attorney's fees upon demand. Landlord agrees Tenant may contest any claim of lien by posting adequate security therefore with Landlord.

## ARTICLE IV

~~DETERMINATION and PAYMENT of PERCENTAGE RENT.~~

~~4.01 Obligation. Tenant agrees to pay Landlord Percentage Rent for each "Lease Year" or "Fractional Lease Year"~~ (as defined in Section 4.02) included in the Lease Term, payable as provided in Section 4.05 in the amount by which Tenant's "Gross Sales" (as defined in Section 4.03) during each Lease Year or Fractional Year, multiplied by the Percentage Rent rate, set forth in Section 1.05 (b), exceeds the Minimum Rent payable for the same period.

4.02 Computation and Payment of Percentage Rent, Definition of Lease Year and Fractional Lease Year. The term "Lease Year" is defined to mean a period of 12 consecutive calendar months, the first full Lease Year commencing on the first day of the calendar month following the Commencement Date of the Lease Term, and each succeeding Lease Year commencing on the anniversary of the commencement of the first Lease Year. Any portion of the Lease Term which is less than a Lease Year shall be deemed a "Fractional Lease Year".

4.03 Definition of Gross Sales. The term "Gross Sales" as used herein is defined to mean the total amount in dollars of the actual sales price, whether for cash or on credit, or partly for cash and partly on credit, of all sales of merchandise and services, including all gift and merchandise certificates, all business conducted on or from the Leased Premises, including but not limited to, all sales to employees of Tenant, all mail or telephone orders received or filled at or from the Leased Premises, all deposits not refunded to purchasers, all orders taken in and from the Leased Premises whether or not such orders are filled elsewhere, receipts or sales through any vending machine or other coin operated device, and sales by any sublessee, concessionaire, licensee and any other person or persons permitted by Landlord to use the Leased Premises. Gross Sales shall not, however, include any sums collected and paid by Tenant for any sales or retail excise tax imposed by any duly constituted governmental authority, nor shall they include any exchange of goods or merchandise between the stores of Tenant where such exchange of goods or merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made at, in or from the Leased Premises, or for the purpose of depriving Landlord of the benefit of sale which otherwise would be made at, in or from the Leased Premises, nor the amount of returns to shippers or manufacturers, nor the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant, nor sales of fixtures after the use thereof which are not part of Tenant's stock in trade. No deduction shall be made from Gross Sales for any franchise, income or gross receipts, or taxes for any other taxes based upon the income of Tenant. Each sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale is made, irrespective of the time when Tenant shall receive payment from its customer, and no deduction shall be allowed for uncollected or uncollectable credit accounts.

4.04 Maintenance of Records for Examination. Tenant shall utilize, and cause to be utilized, cash registers equipped with sealed continuous totals to record all cash sales, and Tenant shall keep on the Leased Premises for at least eighteen (18) months after expiration of each Lease Year, or Fractional Lease Year, records conforming to sound accounting practices showing all of the Gross Sales, made by Tenant or others, at, in, and upon the Leased Premises for such Lease Year or Fractional Lease Year, including all tax reports, sales slips, sales checks, bank deposit records and other supporting data. Within fifteen (15) days after the end of each calendar month, or portion thereof, included in the Lease Term, Tenant shall furnish Landlord a statement, certified by one of Tenant's executive officers or proprietors, of Gross Sales during such month or portion thereof; and on or before April 1, or the end of Tenant's fiscal year for tax purposes, in each calendar year included in the Lease Term, and within sixty (60) days after the end of the Lease Term, Tenant shall furnish Landlord a statement which shall be satisfactory in scope and substance to Landlord, hereinafter called the "annual statement", certified by an independent Certified Public Accountant, approved Landlord, of Gross Sales during the preceding Lease Year or Fractional Lease Year. Landlord shall have the right from time to time by its accountants or representatives to audit all statements of Gross Sales and, in connection with such audits, to examine all records (including all supporting data) of Gross Sales, and Tenant shall make or cause to be made all such records readily available for such examination. If any such audit disclosed that the actual Gross Sales exceed those reported by more than 5%, Landlord shall, in addition to the foregoing rights have the right to treat such erroneous statement as a default hereunder.

4.05 Payment of Percentage Rent. On or before the fifteenth (15th) day after the expiration of such Lease Year or Fractional Lease Year included in the Lease Term, and on or before the fifteenth (15th) day after the expiration or earlier termination of the Lease Term, Tenant shall pay to Landlord the percentage rent, if any, due under this Lease for such period. Landlord shall have the option to require percentage rent to be calculated and paid semi-annually or quarter-annually during any Lease Year on the basis of Tenant's monthly statements of Gross Sales, and Tenant shall pay the amount thereof so accrued for such period within fifteen (15) days after the end of the applicable semi- or quarterly annual period. Upon receipt by Landlord of each annual statement of Tenant's Gross Sales, there shall be an adjustment between Landlord and Tenant, with payment to or repayment by Landlord, as the case may require, to the end that Landlord shall receive the entire amount of percentage rent payable for ~~the preceding Lease Year or Fractional Lease Year and no more.~~

4.06 No Agency or Venture. Nothing contained in this Lease shall be construed as creating a partnership, joint venture or agency between Landlord and Tenant or cause the Landlord to be responsible in any way for the debts or obligations of the Tenant.

ARTICLE V

COMMON AREAS and FACILITIES.

5.01 **Common Areas and Facilities.** Landlord shall make available from time to time such areas and facilities of common benefit to the Tenants and occupants of the Shopping Center as Landlord shall deem appropriate (herein referred to as the "Common Areas"). Landlord shall operate, manage, equip, light, insure, repair and maintain the common areas for their intended purposes in such manner as Landlord shall in its sole discretion determine and may from time to time change the size, location and nature of any common areas, and Landlord shall not be subject to liability therefor, nor shall Tenant be entitled to any compensation, or diminution or abatement of rent, nor shall any such action be deemed an actual or constructive eviction of Tenant.

5.02 **Use of Common Areas.** Tenant and its permitted concessionaires, officers, employees, agents, customers and invitees shall have the non-exclusive right, in common with Landlord and all others, to whom Landlord has or may grant rights, to use the Common Areas as designated from time to time by Landlord, subject to such regulations as Landlord may from time to time impose, including the designation of the days and hours, the Common Areas shall be open and the designation of specific areas in which cars owned by Tenant, its permitted concessionaires, officers, employees, and agents must be parked. If Landlord should designate such parking areas, and any car of Tenant or a permitted concessionaire, officer, employee or agent of Tenant, is parked in any other portion of the Shopping Center, Tenant shall pay to Landlord, upon demand, the sum of Ten Dollars ($10.00) for each such car for each day, or part thereof, such car is parked and Tenant hereby authorizes Landlord to tow or cause any such car to be towed from the Shopping Center and agrees to reimburse Landlord for the cost thereof, upon demand, and to otherwise indemnify and hold Landlord harmless with respect thereof. Tenant agrees to abide by such regulations and to use its best efforts to cause its permitted concessionaires, officers, employees, agents, customers and invitees to conform thereto. Landlord may at any time, close temporarily Common Areas to make repairs or changes or to discourage non-customer parking, and may do such other acts to the Common Area as in its judgement may be desirable to improve the convenience thereof. Tenant shall upon request furnish to Landlord the license numbers and descriptions of the cars operated by Tenant and its permitted concessionaires, officers and employees. Tenant shall not at any time interfere with the rights of Landlord and other Tenants, its and their permitted officers, employees, agents, customers and invitees to use any part of the parking areas and other common areas.

5.03 **Charge for Common Areas and Facilities.** Tenant shall pay to Landlord as additional rent in the manner provided in Section 5.05, Tenant's pro-rata share, as defined in Section 5.04 of "Common Area Maintenance Cost", which term is defined as follows:

"Common Area Maintenance Cost" is defined as all costs and expenses (except taxes covered by Section 8.01 (o) paid or incurred by Landlord during the Lease Term (including appropriate reserves) in operating, managing, equipping, policing (if and to the extent provided by Landlord), protecting, insuring, heating, cooling, lighting, ventilating, repairing, replacing, and maintaining the Common Areas of the Shopping Center. Such costs and expenses shall include but not be limited to: maintaining any enclosed Common Area; cleaning; removal of rubbish and other refuse; line painting; fire protection; exterior illumination of buildings and Common Areas and illumination and maintenance of signs, whether or not the lights or signs are located on the Shopping Center; snow and ice clearance; costs and expenses of planting, maintenance, replanting flowers and other landscaping; water and sewerage charges; premiums for liability, property damage, fire, extended coverage, malicious mischief, vandalism, Workman's Compensation, employees' liability and other insurance paid by Landlord on or in respect of the Shopping Center for any calendar or premium year or part thereof included in the Lease Term or any renewal term; wages; unemployment taxes; social security taxes; special assessments; personal property taxes; fees for audits; required licenses and permits; costs and expenses of supplies; operation of loudspeakers and any other equipment supplying music to the Common Areas; reasonable depreciation of, and rents paid for, the leasing of equipment used in the operation of the Common Areas, the administrative costs equal to fifteen percent (15%) of the total costs of operating and maintaining the Common Areas (except appropriate reserves); but costs of equipment chargeable to capital account and depreciation of the original cost of constructing the Common Areas shall be excluded.

5.04 **Tenant's Pro-Rata Share of Maintenance Costs.** Tenant's pro-rata share of the Common Area maintenance costs shall be the ratio of the total floor area of the Leased Premises to the total floor area of all rentable space in the Shopping Center. "Floor Area" means with respect to any rentable area in the Shopping Center, including the Leased Premises, the square feet of floor space on all floors, therein, measured from the outside of all exterior boundary walls and the midpoint of any interior boundary walls. It shall not include the floor area of roof structures used for mechanical equipment or the Common Areas.

5.05 **Payment of Estimated Charges and Periodic Adjustments.** Tenant shall pay to Landlord in advance, on the first day of each calendar month during the Lease Term, the amount reasonably estimated by Landlord as Tenant's pro-rata share of the Common Areas maintenance cost for such month. Landlord shall furnish Tenant a regular annual statement of the estimated amount of such charges in advance of the due date.

The computation and payment of Common Area maintenance cost shall be based on annual or semi-annual "Computational Periods" of consecutive calendar months on either a calendar or fiscal year basis as determined by Landlord. At the end of any Computational Period, Landlord shall furnish Tenant with a statement prepared in reasonable detail, in accordance with general accounting principles consistently applied, of the actual Common Area maintenance cost paid or incurred by Landlord during such Computational Period and the Tenant's pro-rata share thereof for such period. Within thirty (30) days after receipt of the statement, there shall be a settlement between Landlord and Tenant with payment to the Landlord, or credit to the Tenant, as the case may be, so that the amount of Common Area maintenance cost paid by Tenant shall equal Tenant's pro-rata share thereof for such period as computed hereunder and no more. In the event the Lease Term covers only a portion of a computation period the pro-rata share of Tenant's Common Area maintenance cost for such period shall be adjusted in proportion to the amount of such period covered by the Lease Term.

ARTICLE VI

UTILITY SERVICES.

6.01 **Retail Space.** Tenant shall pay for all utilities used in the Leased Premises, including all electricity, gas, and water and sewer charge, and, at its own costs and expense and with its own equipment, shall heat or chill the water it uses to meet all of its own cost maintain said equipment in good working order during Lease Term. Landlord agrees that the Leased Premises shall be separately metered for gas and electric usage.

~~6.02 Office Space - Utilities. Lessor shall provide during the hours of 8:00 A.M. to 6:00 P.M. Monday through Friday, at its expense, in the area shown on Exhibit "A" as Office Space such heat, light, electricity and air conditioning, if any, as is commercially reasonable for normal office use. Tenant shall promptly reimburse Lessor for its pro-rata share of the cost of all heat, light, electricity and air conditioning. Tenants pro-rata share will be determined by taking the actual heat, light, electricity and air conditioning bill for the period, dividing the amount thereof by the total net leasable area of the Shopping Center, and multiplying the dividend thereof by the number of square feet occupied by the Tenant. Such amount shall be remitted by Tenant to Lessor within Five (5) days of its receipt of an invoice therefor, which shall for all purposes hereunder be deemed to be additional rent.~~

~~6.03 Water. Lessor shall provide water for all agreed upon or allowed uses hereunder. Tenant shall promptly reimburse Lessor for its pro-rata share of the cost of all such water. Tenants pro-rata share shall be determined by taking the entire water bill for the period, dividing the amount thereof by the total net leasable area of the Shopping Center, and multiplying the dividend thereof by the number of square feet occupied by Tenant. Such amount shall be remitted by Tenant to Lessor within five (5) days of its receipt of an invoice therefor, which shall for all purposes hereunder be deemed to be additional rent.~~

~~6.04 Janitorial Services. Lessor shall also provide janitorial services as are commercially reasonable. Said janitorial services shall not include replacement of soap, towels, toilet paper or similar materials unless the restrooms are in common use by more than one tenant of Lessor."~~

ARTICLE VII.

LANDLORD'S ADDITIONAL COVENANTS.

7.01 **Repairs by Landlord.** Landlord shall, at its own expense, keep the foundations and roof of the Leased Premises, and the structural soundness of the concrete floor and exterior walls thereof, in good order, repair and condition unless any necessary work is required because of damage caused by any act, ommission or negligence of Tenant, any permitted concessionaire or their respective employees, agents, invitees, licensees or contractors. Landlord shall not be required to commence any such repair until a reasonable time after written notice from Tenant that the same is necessary. The provisions of this paragraph shall not apply in the case of damage or destruction by fire or other casualty or a taking under the power of eminent domain, in which events the obligations of Landlord shall be controlled by Article IX. Except as provided in this Section 7.01, the Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Leased Premises, or to any equipment, facilities or fixtures contained therein, which shall be the responsibility of Tenant.

7.02 **Quiet Enjoyment.** So long as Tenant pays the rents and observes and performs all of Tenant's obligations under this Lease, Tenant shall quietly enjoy the Leased Premises. Tenant's quiet enjoyment of the Leased Premises shall be subject, however, to the provisions of this Lease and dispossession by reason of superior title. If mortgagee becomes the owner of the Leased Premises by foreclosure or deed in lieu of foreclosure, Tenant's quiet enjoyment shall not be disturbed so long as Tenant is not in default under the Lease; however, that no eviction of the Tenant for any reason whatsoever after the Landlord shall have conveyed the fee of the Leased Premises shall be construed as a breach of this covenant, and no action therefor shall be brought against the Landlord. If the Tenant shall be dispossessed from the Leased Premises by reason of superior title or the foreclosure of any mortgage hereafter placed upon the Leased Premises, the payment of rent shall cease from and after the date of such dispossession, and all rent that Tenant may have prepaid and any security deposit made by Tenant with the Landlord shall be returned to the Tenant forthwith, but the Tenant shall not be entitled to receive from the Landlord any damages suffered by the Tenant as a result of such dispossession.

ARTICLE VIII

TENANT'S ADDITIONAL COVENANTS.

8.01 **Affirmative Covenants.** Tenant covenants, at its expense, at all times during the Lease Term and such further time as Tenant occupies the Leased Premises or any part thereof:

(a) To perform promptly all of the obligations of Tenant as set forth in this Lease, including the obligation to pay when due all rent and all charges, rates and other sums which by the terms of this lease are to be paid by Tenant. Payment of all such amounts shall be paid to: *see below

[illegible]

or to such persons at such other places as Landlord may designate in written notice to Tenant from time to time.

(b) To use the Leased Premises only for the Permitted Uses specified in Section 1.06, to operate its business in the Leased Premises under Tenant's Trade Name as set forth in Section 1.01; and to conduct its business at all times in a high grade and reputable manner so as to produce the reasonable maximum volume of sales and transactions and to help establish and maintain a high reputation for the Shopping Center.

(c) Except when and to the extent that the Leased Premises are untenantable by reason of damage by fire or other casualty, to use and continuously operate for retail sales purposes all of the Leased Premises other than such minor portions thereof as are reasonably required for storage and office purposes; to use such storage and office space only in connection with the business conducted by Tenant in the Leased Premises; to furnish and install all trade fixtures, which shall at all times be suitable and proper for carrying on Tenant's business; to carry a full and complete stock of seasonable merchandise offered for sale at competitive prices; to maintain adequate trained personnel for efficient service to customers; and to open for business and remain open for the customary business hours during all regular and usual business days during the entire Lease Term; and to light its display windows and signs, if any, during any hours when either the Shopping Center or the Leased Premises are open for business.

(d) To store in the Leased Premises only such merchandise as is to be offered for sale at retail within a reasonable time after receipt; to store all trash and refuse in adequate containers within the Leased Premises and to maintain such containers in a healthy, safe, neat and clean condition and in a location so as not to be visible to members of the public shopping in the Shopping Center, and to attend to the daily disposal thereof in the manner designated by Landlord; to keep all drains inside the Leased Premises clean, to receive and deliver goods and merchandise only in the manner and at such times and in such areas, as may be designated by Landlord; and to conform to all rules and regulations which Landlord may make in the management and use of the Shopping Center requiring such conformance by Tenant and Tenant's employees. If the Leased Premises are used for the sale of food for consumption therein, such as for a restaurant or snack bar, Tenant shall store all trash, refuse and garbage in a garbage storeroom or compartment which Tenant shall install and keep in repair at its sole expense.

(e) Except for repairs required to be performed by Landlord pursuant to Section 7.01 to keep the Leased Premises, including but not limited to, the fire protection and sprinkler system, the security screen or wall (store front), condition (including all necessary painting and decorating) and to keep all glass, including that in windows, doors, fixtures and skylights, clean and in good condition, and to replace any glass which may be damaged or broken with glass of the same quality, damage by fire or other casualty covered by Landlord's insurance excepted.

(f) To make all repairs, alterations, additions or replacements to the Leased Premises, required by any law or ordinance or any order or regulation of any public authority; to keep the Leased Premises equipped with all safety appliances so required; to produce any licenses and permits required for any use of the Leased Premises by Tenant; and to comply with the orders and regulations of all governmental authorities.

(g) To pay promptly when due the entire cost of any work in the Leased Premises undertaken by Tenant so that the Leased Premises shall at all times be free of liens for labor and materials; to produce all necessary work permits before undertaking such work; to do all of such work in a good and workmanlike manner, employing materials of good quality; to perform such work only with contractors previously approved of in writing by Landlord; to perform such work with union labor to the extent and in such manner as to ensure proper maintenance of good labor relationship; to comply with all governmental requirements relating to such work; and to save Landlord and Landlord's beneficiaries and agents harmless and indemnified from all injury, loss, claims or damage by any person or property occasioned by or growing out of such work.

(h) To save Landlord, Landlord's beneficiaries and agents and their respective successors and assigns, harmless and indemnified from all injury, loss, claims or damage to any person or property while on the Leased Premises or any other part of the Shopping Center occasioned by any act or omission of Tenant, or anyone claiming by, through or under Tenant.

(i) To maintain, in responsible companies approved by Landlord, public liability insurance, insuring Landlord, Landlord's beneficiaries and agents, Tenant and the holders of any notes secured by a first mortgage or Trust Deed on the Shopping Center and for the Leased Premises, as their interests may appear, against all claims, demands or actions for injury to or death of any one person in an amount of not less than $500,000.00 and for an injury to or death of more than one person in any one accident in an amount of not less than $1,000,000.00 and for damage to property in an amount of not less than $150,000.00 made by or on behalf of any person, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Leased Premises (Landlord shall have the right to direct Tenant to increase such amounts whenever it considers them inadequate) and in addition and in like amounts, covering Tenant's contractual liability under the hold harmless clause set forth in Subsection 8.01 (h); to carry like coverage against loss or damage by boiler or compressors, if there is a boiler or compressor in the Leased Premises; to maintain plate glass insurance covering all exterior plate glass in the Leased Premises and fire insurance with such extended coverage endorsements as Landlord may from time to time require covering all of Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings and equipment in the Leased Premises to the extent of at least eighty percent (80%) of their replacement cost. All of said insurance shall be in the form and in responsible companies satisfactory to Landlord and shall provide that it will not be subject to cancellation, termination or change except after at least thirty (30) days prior to written notice to Landlord. The policies or duly executed certificates for the same (which certificates shall evidence the insurer's respective waivers of subrogation), together with satisfactory evidence of the payment of the premiums thereon, shall be deposited with Landlord on the day Tenant begins Tenant's Work and upon renewal of such policy, not less than thirty (30) days prior to the expiration of the term of such coverage; and that if Tenant fails to comply with such requirements, Landlord may obtain such insurance and keep the same in effect, and Tenant shall pay Landlord the premium cost thereof upon demand as additional rent.

(j) Landlord, and Landlord's beneficiaries, their agents and employees, shall not be liable for, and Tenant waives all claims for, damage to person or property sustained by Tenant or any persons claiming through Tenant resulting from any accident or occurrence in or upon the Leased Premises or the building of which they shall be a part, or any part of the Shopping Center, including but not limited to, claims for damage resulting from (1) any equipment or appurtenances becoming out of repair, (2) Landlord's failure to keep said building or the Leased Premises in repair, (3) injury done or occasioned by wind, water or other natural element, (4) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipe, stairs, railings or walks, (5) broken glass, (6) the backing-up of any sewer pipe or downspout, (7) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or Leased Premises, (8) the escape of steam or hot water, (9) water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, walks or other places upon or near such building or the Leased Premises or otherwise, (10) the falling of any fixture, plaster or ceiling material, and (11) any act, ommission or negligence of co-tenants, or of other persons or occupants of said building or of adjoining or contiguous property or of Landlord, Landlord's beneficiaries, their agents or employees.

(k) To permit Landlord, Landlord's mortgagees and their respective agents to enter the Leased Premises at reasonable times for the purpose of inspecting the same, of making repairs, additions or alterations thereto or to the building in which the same are located, of shoring the foundations and walls thereof, of erecting scaffolding and/or protective barricades around and about the same, and of showing the Leased Premises to prospective purchasers, lenders and tenants.

* Please make check payable to:

NOVOGRODER COMPANIES, INC.

and mail to:

COMMERCIAL PROPERTIES
c/o DELAWARE PLACE BANK
190 East Delaware Place
Chicago, IL 60611

(l) To peacefully and quietly vacate the Leased Premises . termination of this Lease whether by lapse of time or otherwise and remove, at the termination of this Lease, such Tenant's goods and effects as are not permanently affixed to the Leased Premises; to remove such of the alterations and additions made by Tenant as Landlord may request; to repair any damage caused by such removal; and peaceably to yield up the Leased Premises and all alterations and additions thereto (except such as Landlord has requested Tenant to remove) and all fixtures, furnishings, floor coverings and equipment which are permanently affixed to the Leased Premises, which shall thereupon become the property of Landlord, clean and in good order, repair and condition, damage by fire, or other unavoidable casualty excepted. Any personal property of Tenant not removed within five (5) days following such termination shall, at Landlord's option, become the property of the Landlord.

(m) If the mortgagee or trustee named in any First Mortgage or Trust Deed hereafter placed upon the Shopping Center or any part thereof, or upon any portion or all of the Shopping Center and other property, shall elect, by written notice to Tenant, to subject and subordinate the rights and interests of the Tenant under this Lease (in whole or in part) to the lien of its Mortgage or Trust Deed, the rights and interests of Tenant under this Lease shall be so subject and subordinate, provided that the mortgagee or trustee shall agree, in said notice to recognize the Lease of Tenant in the event of foreclosure if Tenant is not in default. Any mortgagee or trustee may, in the alternative, elect to give some or all of the rights and interest of Tenant under this Lease priority over the lien of its Mortgage or Trust Deed. The election of such Mortgagee or Trustee shall be binding upon Tenant whether this Lease is dated prior to or subsequent to, the date of said Mortgage or Trust Deed. Tenant shall execute and deliver whatever instruments may be required for such purposes, and in the event Tenant fails to do so within ten (10) days after demand in writing, Tenant does hereby make, constitute and irrevocably appoint Landlord as its attorney in fact and in its name, place and stead so to do.

(n) To promptly become a member of, and at all times maintain membership in any merchants association of the Tenant's and/or occupants in the Shopping Center in the event such an association is formed by Landlord or a majority of tenants in the Shopping Center. Tenant hereby agrees to abide by the By-Laws, rules and regulations thereof, to use Tenant's best efforts to develop within such association

in any joint promotional sales campaign put on by such association. Tenant agrees to pay Tenant's proportionate share of the promotional and other expenses of such merchant's association which are allocable to all the tenants in the Shopping Center in accordance with the By-Laws thereof from time to time in force and effect, and such association, as a third party beneficiary of this covenant between Landlord and Tenant, shall have the right to proceed directly against Tenant to collect such share without the participation of Landlord in any such action.

(o) To pay to Landlord, as additional rent hereunder, Tenant's pro-rata share of all real estate taxes paid by Landlord on the Shopping Center for any calendar year or part thereof included in the Lease Term. Tenant's pro-rata share of real estate taxes shall be the ratio of the total floor area of the Leased Premises to the total floor area of all rentable space in the Shopping Center. Tenant's share shall be pro-rated in the event the Lease Term covers only a part of any tax year. The term "real estate taxes" as used in this Lease, shall mean all taxes and assessments, general, special and otherwise, levied, assessed or imposed at any time by any governmental authority upon or against the rentals payable by tenants of the Shopping Center to the Landlord, either by way of substitution for the taxes and assessments levied, assessed or imposed against such land and/or improvements, or (other than an income or franchise tax) in addition thereto. Tenant shall pay to Landlord in advance monthly installments one twelfth (1/12th) of the amount reasonably estimated by Landlord to be Tenant's pro-rata share of such assessment, real estate taxes and insurance premiums commencing on the first day of the calendar month next succeeding the Commencement Date, and this covenant shall survive the expiration or earlier termination of the Lease Term. Within ninety (90) days after the end of each Lease Year, Landlord shall compute the actual amount of Tenant's pro-rata share of the foregoing charges for such year and furnish to Tenant a statement in reasonable detail. Within (30) days thereafter, there shall be a settlement between Landlord and Tenant with payment to Landlord, or credit to Tenant, as the case may be, so that Tenant's actual payments shall be equal to Tenant's pro-rata share of such charges for such Lease Year and no more.

(p) To remain fully obligated under this Lease notwithstanding any assignment or sublease or any indulgence granted by Landlord to Tenant or to any assignee or sublessee.

(q) To promptly furnish to Landlord, whenever requested, financial statements reflecting Tenant's current financial condition.

(r) To give Landlord prompt written notice of any accident, fire or damage occuring on or to the Leased Premises or the Common Area of which Tenant has knowledge.

(s) To pay on demand Landlord's expenses, including reasonable attorney's fees and court costs, incurred in enforcing any obligation of Tenant under this Lease, including any default by Tenant as provided in Section 10.03, and in defending or participating in any legal proceedings initiated by or on behalf of Tenant wherein Landlord is not found to be in default hereunder.

(t) To furnish, maintain and provide, at Tenant's sole cost and expense the following insurance coverage for the benefit of the Landlord and the Tenant, during the entire term of the Lease, if applicable: liquor liability insurance insuring against claims for personal injury, loss of means of support, death and property damage caused by the intoxication of any person who was either sold or given alcoholic beverages on or about Tenant's premises. The limitation of liability shall not be less than $500,000.00 and such insurance shall name as insured the Landlord, Landlord's beneficiaries and agents, Tenant and the holders of any notes secured by a First Mortgage or Trust Deed on the Shopping Center and/or the Leased Premises, as their interest may appear. Such policy may be a blanket policy covering other locations and evidence of such insurance shall be delivered to Landlord upon demand. If Tenant fails tyo obtain such insurance or to maintain same in effect or to furnish Landlord with such evidence, Landlord shall have the right to obtain such insurance and to add the cost thereof to the rent then due or becoming due hereunder.

8.02 **Negative Covenants.** Tenant covenants at all times during the Lease Term and such further time as Tenant occupies the Leased Premises or any part thereof:

(a) Not to injure, overload, deface or otherwise harm the Leased Premises; nor commit any nuisance; nor unreasonably annoy owners or occupants of neighboring property; nor use the Leased Premises for any extra-hazardous purpose, or in any manner will suspend, void or make inoperative any policy or policies of insurance of any kind generally in use in the State of Illinois, at any time carried on any improvements within the Shopping Center, or in any manner which will increase the cost of any of Landlord's insurance; nor burn any trash or refuse within the Shopping Center; nor without first receiving Landlord's prior written consent and providing the insurance required under Section 8.01 (t); sell, distribute or give away any product which tends to create a nuisance in the Common Areas, nor make any use of the Leased Premises which is improper, offensive or contrary to any law or ordinance or any regulation of any governmental authority; or conduct or permit any going-out of business, bankruptcy, fire or auction sales on the Leased Premises; nor use any advertising medium which might be annoying, such as hand bill, flashing lights, searchlights, loudspeakers, phonographs, sound amplifiers or radio or television receiving equipment in a manner to be seen or heard outside the Leased Premises; nor load, unload or park any truck or other delivery vehicle in any area of the Shopping Center other than the area or areas designated therefor by Landlord; nor use any sidewalks, walkways, malls or Common Areas in the Shopping Center for the storage or disposal of trash or refuse or the selling or displaying of any merchandise or other object, including but not by way of limitation, the use of any of the foregoing for any news stand, cigar stand, sidewalk shop or any other business occupation or undertaking (such latter uses being reserved to Landlord and its designees); nor place any fence, structure, barricade, building, improvement division rail or obstruction of any type or kind on any part of the Common Areas; nor use the Common Areas for any purpose other than the use designated by Landlord; nor install or use any sign or other advertising device on the exterior of the Leased Premises other than a store identifying sign approved by Landlord; nor use or permit the use of any portion of the Leased Premises as living quarters, sleeping apartments or lodging rooms; nor do any act tending to injure the reputation of the Shopping Center.

(b) Not to make any alterations or additions, nor permit the making of any holes in the walls, partitions, ceilings or floors, nor permit the painting or placing of any exterior signs, placards or other advertising media, awnings, aerials, antennas, or the like, without on each occasion obtaining the prior written consent of Landlord.

(c) Not to assign, sell, mortgage, pledge or in any manner transfer this Lease or grant any interest therein, by operation of law or otherwise, or sublet or grant license to use the Leased Premises or any part or parts thereof, or permit occupancy thereof by anyone with, through or under it.

(d) Not suffer any mechanic's lien to be filed against the Leased Premises, or any other portion of the Shopping Center by reason of any work, labor, service or materials performed at or furnished to the Leased Premises for Tenant, or for anyone holding the Leased Premises through or under Tenant. If any such mechanic's lien shall at any time be filed, Tenant shall forthwith cause the same to be discharged of record by payment, bond, order of a court of competent jurisdiction, or otherwise, but Tenant shall have the right to contest any and all such liens, provided security deposit satisfactory to Landlord is deposited with it. If Tenant shall fail to cause such lien to be discharged within thirty (30) days after being notified of the filing thereof and before judgement or sale thereunder, then in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by bonding or other proceeding deemed appropriate by Landlord, and the amount so paid by Landlord and/or all costs and expenses, including reasonable attorney's fees and court costs, incurred by Landlord in procuring the discharge of such lien, shall be deemed to be additional rent and, together with interest thereon as provided in Section 10.3, shall be due and payable by Tenant to Landlord on the first day of the next following month. Nothing in this Lease contained shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Leased Premises to any lien or liability under the Mechanic's Lien Law of the Sate of Illinois.

## ARTICLE IX

### DAMAGE, DESTRUCTION and EMINENT DOMAIN

9.1 **Fire, Explosion or Other Casualty.** In the event the Leased Premises are damaged by fire, explosion or any other casualty to an extent which is less than fifty percent (50%) of the cost of replacement of the Leased Premises, damage shall promptly be repaired by Landlord at Landlord's expense, provided that Landlord shall not be obligated to so repair if such fire, explosion or other casualty is caused directly or indirectly by the negligence of Tenant, its agents servants or employees, and provided further that Landlord shall not be obligated to expend for such repair an amount in excess of the insurance proceeds recovered or recoverable as a result of such damage, and that in no event shall Landlord be required to repair or replace Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings and equipment. In the event of any such damage, and (a) Landlord is not required to repair as hereinabove provided, (b) the Leased Premises shall be damaged to the extent of fifty percent (50%) or more of the cost of replacement, or (c) the building of which the Leased Premises is a part is damaged to the extent of twenty-five percent (25%) or more of the cost of replacement, or (d) all buildings (taken in aggregate) in the Shopping Center shall be damaged to the extent of more than twenty-five percent (25%) of the aggregate cost of replacement, Landlord may elect either to repair or rebuild the Leased Premises or the building or buildings or to terminate this Lease upon giving notice of such election to Tenant within ninety (90) days after the occurrence of the event causing the damage. If the casualty, repairing, or rebuilding shall render the Leased Premises untenantable, in whole or in part, and the damage shall not have been due to the default or neglect of Tenant, a proportionate abatement of the Minimum Rent shall be allowed from the date when the damage occurred until the date Landlord completes the repairing or rebuilding, said proportion to be computed on the basis of the relation which the gross square footage area of the space rendered untenantable bears to the Floor Area of the Leased Premises. If Landlord is required or elects to repair the Leased Premises as herein provided, Tenant shall repair or replace its stock in trade, fixtures, furniture, furnishings, floor coverings and equipment, and if Tenant has closed for business, Tenant shall promptly re-open for business upon the completion of such repairs.

9.2 **Eminent Domain.** If the whole of the Leased Premises shall be taken by any public authority under the power of eminent domain, the Lease Term shall cease as of the day possession shall be taken by such public authority and Tenant shall pay rent up to that date with an appropriate refund by Landlord of any rent which has been paid in advance for a period subsequent to the date possession is taken. If twenty-five percent (25%) or less of the Floor Area of the Leased Premises shall be so taken, the Lease Term shall cease only on the parts so taken as of the day possession shall be so taken by such public authority and Tenant shall pay rent up to that day with an appropriate refund by Landlord of any rent which has been paid in advance for a period subsequent to the date possession is so taken, and thereafter the Minimum Rent shall be equitably adjusted. Landlord shall at its expense make all necessary repairs or alterations to the basic building and exterior thereof so as to constitute the remaining premises a complete architectural unit; provided, that Landlord shall not be obligated to undertake any such repairs or alterations if the total estimated cost thereof will exceed the amount of the award with respect to the Leased Premises. If more than twenty-five percent (25%) of the Floor Area of the Leased Premises shall be so taken, then the Lease Term shall cease only on the part so taken from the day possession shall be taken by such authority and Tenant shall pay rent up to that day with an appropriate refund by Landlord of any rent which has been paid in advance for a period subsequent to the date possession is so taken, and either party shall have the right to terminate this Lease upon notice in writing within ten (10) days after taking possession. In the event Tenant remains in possession and Landlord does not so terminate, all of the terms herein provided shall continue in effect, except that the Minimum Rent shall be equitably abated, and Landlord shall make all necessary repairs or alterations to the basic building and exterior thereof so as to constitute the remaining premises a complete architectural unit; provided, that Landlord shall not be obligated to undertake any such repairs or alterations if the estimated cost thereof will exceed the amount of the award with respect to the Leased Premises. If more than twenty-five percent (25%) of the Floor Area of the building in which the Leased Premises are located, or more than twenty-five percent (25%) of the aggregate floor area of all the buildings in the Shopping Center shall be taken under the power of eminent domain, Landlord may, by notice in writing to Tenant, delivered on or before the day surrendering possession to the public authority, terminate this Lease, and rent shall be paid or refunded as of the date of termination. All compensation awarded for any taking under the power of eminent domain, whether for the whole or a part of the Leased Premises, shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of the leasehold or to the fee of the Leased Premises or otherwise, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation provided, however, that Landlord shall not be entitled to any award made expressly to Tenant for the taking of Tenant's trade fixtures, furniture or leasehold improvements to the extent of the cost of Tenant of said improvement (exclusive of Landlord's contribution) less depreciation computed from the date of said improvements to the expiration of the original term of this Lease.

## ARTICLE X

### DEFAULTS by TENANT and REMEDIES

10.1 **Defaults by Tenant.** Landlord may, at its option, terminate this Lease if any default by Tenant continues after notice, in case of non-payment of rent or any other payment provided to be made hereunder for more than five (5) days, or in case of any other default that Tenant does not cure within 15 days; or if Tenant makes any assignment for the benefit of creditors, commits any act of bankruptcy, or files a petition under any bankruptcy or insolvency law; or if such a petition is filed against Tenant and is not dismissed within thirty (30) days; or if Tenant does not pay, after demand, any other liability to Landlord arising out of, or in connection with, the construction or operation of the Shopping Center; or if Tenant falsifies any monetary report to Landlord; or if a receiver or similar officer becomes entitled to this Leasehold; or, if Tenant's interest in this Lease is taken on execution or other process of law in any action against Tenant; or if Tenant does, or permits to be done, any act which creates a mechanics lien or claim thereof against the Leased Premises of the Shopping Center and Tenant does not comply with the provisions of Section 8.2 (d). Upon such termination of this Lease, Landlord may re-enter the Leased Premises, with or without process of law, using such force as may be necessary, and remove all persons, fixtures, and chattels therefrom, and Landlord shall not be liable for any damages resulting therefrom; Landlord, upon such repossession of the Leased Premises, shall be entitled to recover as liquidated damages and not as a penalty, a sum of money equal to the value of the Minimum Rent, ~~Percentage Rent [illegible]~~ Upon the happening of any more of the above-mentioned events, Landlord may repossess the Leased Premises by forcible entry or detainer suit, or otherwise without demand or notice of any kind to Tenant (except as hereinabove expressly provided for) and without terminating this Lease in which event Landlord may, but shall be under no obligation so to do, relet all or any part of the Leased Premises for such rent and upon such terms as shall be satisfactory to Landlord (including the right to relet the Leased Premises for a term greater or lesser than that remaining under the Lease Term, and the right to relet the Leased Premises as a part of the larger area, and the right to change the character or use made of the Leased Premises). Landlord may, for the purpose of such reletting, decorate and make any repairs, changes, alterations and additions in or to the Leased Premises that it may deem necessary or convenient. If Landlord does not relet the Leased Premises, Tenant shall pay to Landlord, on demand, as liquidated damages and not as a penalty, a sum equal to the amount of the Minimum Rent, ~~Percentage Rent [illegible]~~ and other sums provided herein to be paid by Tenant for the remainder of the Lease Term. If the Leased Premises are relet and a sufficient sum shall not be realized from such reletting after paying all of the expenses of such decorations, repairs, changes, alterations, additions, the expenses of such reletting and the collection of the rent accruing therefrom to satisfy the rent herein provided to be paid for the remainder of the Lease Term, Tenant shall pay to Landlord, on demand, any deficiency; and Tenant agrees that Landlord may, from time to time, file suit to recover any sums falling due under the terms of this section. Landlord is hereby given a first lien upon all property of Tenant, including but not limited to, all trade fixtures, which shall come in or be placed upon the Leased Premises, and whether acquired by Tenant before or after the date hereof, to secure the payment of rent and the performance of each and every other covenant herein contained to be performed by Tenant. The rights and remedies herein contained and reserved to Landlord shall not be considered as exclusive of any other right or remedy of Landlord, but shall not be construed as cumulative and shall be in addition to every other remedy now or hereafter existing at law, in equity or by statute.

10.02 **Holdover by Tenant.** In the event Tenant in possession of the Leased Premises after expiration of the tenancy hereunder, and without the execution of a new Lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Leased Premises as a tenant from month-to-month, at twice the Minimum Rent, ~~[illegible]~~ and twice all the other charges due hereunder, and subject to all the other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

10.03 **Landlord's Right to Cure Defaults.** Landlord may, but shall not be obligated to, cure at any time, without notice, any default by Tenant under this Lease; and whenever Landlord so elects, all costs and expenses thereby incurred by Landlord, including, without limitation, reasonable attorney's fees and court costs together with interest on the amount of costs and expenses so incurred at the rate of eighteen percent (18%) per annum.

10.04 **Effect of Waivers of Default.** No consent or waiver, expressed or implied, by Landlord to or of any breach of any covenant, condition or duty of Tenant shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty.

10.5 **Security Deposit.** To secure the faithful performance by Tenant of all of the covenants, conditions and agreements set forth in this Lease to be performed by it, including, but without limiting the generality of the foregoing, such covenants, conditions and agreements in this Lease which become applicable upon its termination by re-entry or otherwise, and also to indemnify Landlord against any damages, costs, expenses, brokerage commissions or attorney's fees which Landlord may suffer by reason of default by Tenant, Tenant has deposited with Landlord the sum set forth in Section 1.7 as a "Security Deposit" on the understanding; (a) that the Security Deposit or any portion thereof may be applied to the curing of any default that may exist, without prejudice to any other remedy or remedies which the Landlord may have on account thereof (which, in no event, shall limit the remedies of Landlord to the Security Deposit), and upon such application Tenant shall pay Landlord on demand the amount so applied which shall be added to the Security Deposit so the same will be restored to its original

amount, (b) that should the Leased Premises be conveyed b[illegible] lord, the Security Deposit or any balance thereof may be turned over to Landlord's grantee, and [illegible] ame be turned over, as aforesaid, Tenant hereby releases Landlord from any and all liability with respect to the Security Deposit and its application or return, and Tenant agrees to look solely to such grantee for such application or return; (c) that Landlord or its beneficiaries shall not be obligated to hold the Security Deposit as a separate fund, but may commingle it with other funds, (d) that if Tenant shall faithfully perform all of the covenants and agreements in this Lease contained on the part of Tenant to be performed, the Security Deposit, or any then remaining balance thereof, shall be returned to Tenant, without interest, within thirty (30) days after the expiration of the Lease Term; and (e) that nothing herein shall be construed to limit the amount of damages recoverable by Landlord or any other remedy of Landlord to the Security Deposit.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1 **Mutual Waiver of Subrogation Rights.** Whenever (a) any loss, cost, damage or expense resulting from fire, explosion or any other casualty or occurrence is incurred by either of the parties to this Lease in connection with the Leased Premises or the building in which the Leased Premises are located, and (b) such party is then covered in whole or in part by insurance with respect to such loss, cost, damage or expenses, then the party so insured hereby releases the other party from any liability it may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance, and waives any right of subrogation which might otherwise exist in or accrue to any person on account thereof, provided that such release of liability and waiver of the right of subrogation shall not be operative in any case where the effect thereof is to invalidate such insurance coverage or increase the cost thereof (provided, taht in the case of increased cost the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereupon keeping such release and waiver in full force and effect).

11.2 **Notices From One Party to the Other.** All notices, demands and requests required or permitted under this Lease shall be in writing. All notices, demands and requests shall be deemed to have been properly given when served personally or deposited in a Post Office or branch Post Office regularly maintained by the United States Government, Certified Mail - Return Receipt Requested - with postage prepaid; addressed to Landlord at the address appearing in Section 1.1 (a) and addressed to Tenant at the Leased Premises as stated in Section 1.1 (b). At any time when the Tenant's interest herein shall be vested in more than one person, firm or corporation, notice shall be conclusively deemed to have been given to all such persons, firms and corporations. Any notice, demand or request given by Tenant to the Landlord shall be ineffective unless all such persons, firms or corporations shall have previously given notice to the Landlord, signed by each of them, designating one or more of them to give the notice, demand or request referred to.

11.3 **Brokerage.** Tenant warrants that it has no dealings with any broker or agent in connection with this Lease other than Landlord's broker, if any, and covenants to pay, hold harmless and indemnify Landlord from and against any and all cost, expense or liability for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease or the negotiation thereof.

11.4 **Relationship of the Parties.** Nothing contained herein shall be deemed or construed by the parties nor by any third party as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular number is used, the same shall include the plural, and the neuter gender shall include the masculine and feminine genders.

11.5 **Estoppel Certificates.** At any time and from time to time, Tenant agrees, upon request in writing from Landlord, to execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and stating the modifications), the dates to which the Minimum Rent, Percentage Rent, and other charges have been paid, and any other factual data relating to this Lease of the Leased Premises which Landlord may request.

11.6 **Short Form Lease.** Tenant agrees not to record this Lease, and Landlord and Tenant agree to execute, acknowledge and deliver, if party shall so request, a "Short Form Lease" suitable for recording.

11.7 **Interest on Unpaid Amounts.** All amounts owed by the Tenant to the Landlord hereunder, shall be deemed to be additional rent and shall, unless otherwise provided herein, be paid within ten (10) days from the date the Landlord renders statements of account thereof. All amounts (including Minimum Rent and Percentage Rent) shall bear interest from the date due until the date paid at the rate of eighteen percent (18%) per annum until paid.

[illegible] **Applicable Law and [illegible].** The law of the State of Indiana shall govern the validity, performance and enforcem[illegible] this Lease. The invalidity or unenforceability of any provision of this Lease shall not affect or imp[illegible] any other provision. The headings of the several Articles and Sections contained herein are for convenience only and do not define, limit or construe the contents of such Articles or Sections.

11.9 **Delays.** Whenever a period of time is provided in this Lease for Landlord to do or perform any act or thing, Landlord shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control or other causes beyond the reasonable control of Landlord, and the time for performance specified herein shall be extended for the amount of time Landlord is so delayed.

11.10 **Execution of Lease by Landlord and Tenant.** Except as stated in this Lease, no employee or agent of Landlord, or of Landlord's broker, if any, has the authority to make or execute a lease or any other agreement or undertaking in connection herewith. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises, and this document will become effective and binding only upon execution and delivery by Landlord and Tenant. All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord and Tenant and no act or omission of any employee or agent of Landlord or of Landlord's broker, if any, shall alter, change or modify any of the provisions hereof.

11.11 **Binding Effect of Lease, Assignment by Landlord.** The covenants, agreements and obligations herein contained, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns. Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment and the assumption by the assignee of the covenants and agreements to be performed by Landlord herein, Landlord and its successors and assigns (other than the assignee of this Lease) shall be released from any and all liability hereunder.

11.12 **Joint and Several Liability of Tenant.** If there is more than one party tenant, the covenants of the Tenant shall be the joint and several obligations of each party, and if the Tenant is a partnership, the covenants of the Tenant shall be the joint and several obligations of each of the partners and the obligations of the firm.

11.13 **Confession of Judgement.** Lessee hereby irrevocably constitutes and appoints any attorney of any court of record in this State, to be his true and lawful attorney for him and in his name and stead, to enter his appearance in any suit or suits that may be brought in any court of this State at any time when any money is due hereunder for rent or otherwise, to waive the issuance of process and service thereof and trial by jury or otherwise, and to confess a judgment or judgments for such money so due and for costs of suit and for reasonable attorney's fees in favor of Lessor, and to release all errors that may occur or intervene in such proceedings, including the issuance of execution upon such judgment, and to stipulate that no writ of error or appeal shall be prosecuted from such judgment or judgments, nor any bill inquity filed, nor any proceedings of any kind taken in law or equity to interfere in any way with the operation of such judgment of judgments or of execution issued thereon and to consent that execution may immediately issue thereon.

11.14 **Cancellation.** If any lending institution shall require a change or changes in this Lease as a condition to extending financing on the security of the Shopping Center or this Lease other than to increase the rent or other sums payable by Tenant or to alter the Lease Term or restrict Tenant's use of the Leased Premises, and if Tenant refuses to agree thereto, Landlord may terminate the Lease upon ninety (90) days advance notice to Tenant, in which event Landlord shall reimburse Tenant for the cost of all Tenant improvements and expenses of moving Tenant's stock and trade fixtures to a distance of 25 miles from the Shopping Center.

11.15 **Counterparts.** This Lease may be executed in one or more counterparts, but all such counterparts shall be one and the same single instrument.

11.16 **Late Charges.** In the event Tenant fails to pay to Landlord when due any installment of rental or other sum to be paid to Landlord which may become due hereunder, Landlord will incur additional expenses in an amount not readily ascertainable and which has not been elsewhere provided for between Landlord and Tenant. If Tenant should fail to pay to Landlord when due any installment of rental or other sum to be paid hereunder, Tenant will pay Landlord on demand a late charge of five percent (5%) of such installment or other sum overdue in any month (with a minimum charge of $50.00 in any one month) and five percent (5%) each month thereafter until paid in full. Failure to pay such late charge upon demand therefor shall be an event of default hereunder. Provision for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner.

IN WITNESS WHEREOF, the Landlord and Tenant have duly executed and delivered this Lease between them, as of the date first above set forth.

11.17 Landlord will loan Tenant $50,000.00 toward Tenant Improvements, to be paid as follows:

1.) $5,000.00 when permits are issued RB [illegible]

2.) ~~$45,000.00~~ 35,000.-- when Certificate of Occupancy is issued and all waivers are sent to Landlord.

3.) No portion of this Tenant Improvement allowance can be used for equipment, furniture or signs.

11.18 Landlord will the tape walls, provide an open ceiling with hanging lighting, and build-out a bathroom at rear of space. All other work will be completed by Tenant.

4. 10,000.⁰⁰ Draw when ready for Paint. LL RB MB

LANDLORD:

THE NOVOGRODER COMPANIES, INC.
As Managing Agent for LOWELL COMMONS

By ______________________
GEORGE NOVOGRODER

TENANT:

By ______________________
RON BURGET

______________________
MICHELLE BURGET

______________________
LARRY LUEBCKE



NOVOGRODER COMPANIES, INC.

RIDER TO LEASE dated February 10, 2010
between **Ron Burget and Michelle Burget and Larry Luebcke,** (Tenant)
and **NOVOGRODER COMPANIES, INC.** As Managing Agent for
LOWELL COMMONS (Landlord)

Date of this Rider: **February 1, 2012**

1. Effective February 1, 2012, Gregory Galgan is added as an additional Tenant on the above-referenced Lease.
2. All other terms and conditions of the existing Lease shall remain the same.

**LANDLORD**
THE NOVOGRODER COMPANIES, INC.
As Managing Agent for LOWELL COMMONS

By__________________________
George Novogroder, President

**TENANT**
GREGORY GALGAN

By__________________________
Gregory Galgan